# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01213-COA

MELINDA THOMAS                                                            APPELLANT

v.

THE SHED 53, LLC                                                          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/01/2020 |
| TRIAL JUDGE: | HON. LAWRENCE PAUL BOURGEOIS JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | CHARLES MARSHALL THOMAS |
| ATTORNEYS FOR APPELLEE: | R. LANE DOSSETT |
| | L. CLARK HICKS JR. |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 12/14/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BARNES, C.J., FOR THE COURT:**

¶1.    Melinda Thomas filed a premises liability action against The Shed 53 LLC in Gulfport, Mississippi, for injuries she sustained at The Shed restaurant[1] when a picnic bench Thomas had been sitting on collapsed, and she fell to the ground.  Ultimately, The Shed moved for summary judgment, and in response, Thomas submitted two expert witness opinions that The Shed provided substandard furniture for its customers.  The Shed then moved to strike the experts' opinions.  The Harrison County Circuit Court granted The Shed's motion to strike and granted summary judgment in favor of The Shed.  Thomas

---

[1] The Shed 53 LLC was the entity created for the Gulfport franchise.

appealed both rulings. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On the afternoon of September 19, 2015, Thomas and her family were having an early dinner at The Shed, a barbecue restaurant. They sat outside at one of the restaurant's wooden picnic tables with attached wooden benches. After Thomas finished her meal, she heard two loud consecutive popping sounds. The bench collapsed, and she fell to the ground. Upon inspection, the wooden seat boards on which Thomas had been sitting had cracked in half. The Shed's staff responded quickly to determine if Thomas needed medical assistance, but she declined an ambulance and drove home. The Shed's management contacted Thomas a few days later to see how she was. Thomas later claimed she sustained injuries to her back, wrist, and ankle from the incident.

¶3. The Shed was the first franchise of The Shed Barbecue, opening in Gulfport in 2008 and closing in May 2016. During this time period, Dean Holleman, Clay Easterling, and Allyson Brewer were the owners of the Gulfport franchise. When The Shed opened, the owners purchased outdoor seating for its guests, which consisted of wooden picnic tables with attached wooden benches. These tables were used for seating outside in the restaurant's courtyard.

¶4. Joe Mullinax, a manager of The Shed, testified that the picnic tables were purchased from Lowe's or Home Depot and that The Shed routinely inspected them thoroughly for safety. There had never been a problem with the benches or a defect detected with the bench at issue. Easterling confirmed that inspections were performed often on the benches, and

2

water sealant was applied frequently to them. When walking through the restaurant on a daily basis, Easterling further testified, he never saw a problem with the bench that would make him believe it was subject to failure or might collapse. Further, no customer, staff member, or employee had ever reported a defect with the bench before it broke, and The Shed had not modified it in any way.

¶5. Beth Burdeshaw, the general manager of The Shed from 2011 to 2015, testified that occasionally a picnic table would need repairs, and Easterling would direct an individual to repair it. However, if the tables could not be repaired, they were discarded. At one point, Burdeshaw decided additional tables were needed to replace discarded ones; so in the spring of 2014 she purchased seven to ten similar, new wooden picnic tables from Lowe's on sale for $99 each. The tables were rotated in the courtyard, and the employees were to tell her if they detected a problem with them. Burdeshaw testified that the tables were "constantly" monitored, and she was shocked the bench at issue collapsed.

¶6. Thomas testified that on the day of the incident, when she sat down, she did not notice anything unusual about the bench or any defect; the seat boards appeared solid, sturdy, and not rotten. Thomas stated she had no explanation or evidence as to why the bench collapsed. Further, the seat boards did not break until after Thomas had finished her meal and was waiting on her family to finish their meals.

¶7. In September 2017, Thomas filed a personal injury lawsuit seeking damages caused by her fall. After discovery, The Shed moved for summary judgment, arguing that the picnic table at issue was not in a dangerous condition. Further, The Shed maintained it had no

actual or constructive knowledge of any dangerous condition with the bench to cause Thomas's injury; The Shed reasonably inspected and maintained the restaurant, including its picnic benches. Therefore, The Shed argued it did not breach any duty owed to Thomas and, thus, was not negligent. In support, The Shed relied on the deposition testimony of Mullinax, Burdeshaw, and Easterling.

¶8. Thomas filed a responsive motion in opposition to summary judgment, arguing The Shed provided substandard furniture for its guests that was not intended for commercial use. In support, Thomas submitted affidavit testimony and opinions of two expert witnesses, Dr. Eric Nusbaum (a professor) and Andrew Cherepon (an engineer). Dr. Nusbaum provides consulting and training for businesses in the hospitality and service industries, having earned degrees in hotel administration, hospitality design, and a Ph.D. in industrial engineering and operations research. Cherepon is a licensed professional engineer specializing in accident reconstruction and forensic engineering. Generally, their opinions were that The Shed should have used higher quality picnic tables. Dr. Nusbaum, who has been involved in restaurant and hotel operations for over thirty years, opined that the industry standard for restaurants is to provide commercial-grade products, and the picnic table failed to meet these requirements. Cherepon inspected an "exemplar" picnic table he claimed was substantially similar to the picnic table at issue. He determined that the subject table was rated for residential use and therefore was made of an inferior grade of lumber with more knots, which contributed to its failure. The Shed responded by filing a motion to strike the expert opinions of Dr. Nusbaum and Cherepon, arguing that the opinions were impermissible under

4

*Daubert*[2] because they had no objective scientific basis.

¶9.     After a hearing, the trial court granted both The Shed's motion to strike and motion for summary judgment.  Regarding the motion to strike, the trial court found the opinions were not relevant because they did not address whether The Shed had actual or constructive notice of a defect with the bench; further, the opinions were not scientifically reliable.  In granting summary judgment in favor of The Shed, the trial court found "nothing inherently dangerous about a wooden picnic bench."  Even though the bench broke, the court found "a mechanical malfunction alone does not cause an ordinary item to become a dangerous condition."  Moreover, the trial court found that even if the stricken opinions of Thomas's experts were considered, they did not create a genuine issue of material fact that The Shed had any notice of a defect.

## STANDARD OF REVIEW

¶10.    The appellate court reviews the trial court's grant or denial of summary judgment de novo.  *Karpinsky v. Am. Nat'l Ins. Co.*, 109 So. 3d 84, 88 (¶9) (Miss. 2013).  The evidence is viewed in the light most favorable to the nonmoving party.  *Id.*  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Id.* at (¶10) (quoting M.R.C.P. 56(c)).  The defendant carries the initial burden of persuading the trial court that no genuine issue of material fact exists and judgment as a matter of law is proper.  *Id.* at

---

[2] *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993).

(¶11). The party opposing summary judgment "may not rest upon the mere allegations or denials of his pleadings, but his response . . . must set forth specific facts showing there is a genuine issue for trial." *Id.* at (¶10) (quoting M.R.C.P. 56(e)).

¶11. The standard of review for the admission or exclusion of evidence, including expert testimony, is an abuse of discretion. *Tunica County v. Matthews*, 926 So. 2d 209, 212 (¶5) (Miss. 2006).

## ANALYSIS

¶12. Thomas argues that summary judgment was improper because she presented evidence creating a genuine issue of material fact on the following: (1) The Shed knew or should have known of the bench's dangerous condition that caused her injuries; (2) The Shed created the dangerous condition by purchasing inexpensive, residential-grade wooden picnic benches that routinely failed; and (3) The Shed performed substandard inspections that failed to detect any issues with the subject bench. Thomas also asserts that her expert witnesses' opinions were improperly stricken because they proved The Shed used substandard furniture.

¶13. Mississippi utilizes a three-step analysis for premises liability cases: "First, we must determine whether the injured party was an invitee, licensee, or a trespasser at the time of the injury. Next, we must determine what duty was owed to the injured party by the business owner/operator. Finally, we must determine whether that duty was breached." *Walker v. Cellular S. Inc.*, 309 So. 3d 16, 24 (¶27) (Miss. Ct. App. 2020) (quoting *Haggard v. Wal-Mart Stores Inc.*, 75 So. 3d 1120, 1124 (¶9) (Miss. Ct. App. 2011)). Regarding the duty

6

element, "the owner or operator of business premises owes a duty to an invitee to exercise reasonable care to keep the premises in a reasonably safe condition." *Jones v. Wal-Mart Stores E. LP*, 187 So. 3d 1100, 1103 (¶12) (Miss. Ct. App. 2016) (quoting *Jerry Lee's Grocery Inc. v. Thompson*, 528 So. 2d 293, 295 (Miss. 1988)). However, a business owner "is not an insurer of business invitees' injuries." *Id.* (quoting *Byrne v. Wal-Mart Stores Inc.*, 877 So. 2d 462, 465 (¶6) (Miss. Ct. App. 2003)). "Under Mississippi law proof of an injury is not the basis for premises liability, rather negligence of the business owner must be shown." *Almond v. Flying J Gas Co.*, 957 So. 2d 437, 439 (¶7) (Miss. Ct. App. 2007) (citing *Sears, Roebuck & Co. v. Tisdale*, 185 So. 2d 916, 917 (Miss. 1966)).

¶14. To recover in a premises liability action, the plaintiff must prove one of three theories: "(1) a negligent act by the defendant caused the plaintiff's injury; or, (2) that defendant had actual knowledge of a dangerous condition, but failed to warn the plaintiff of the danger; or, (3) the dangerous condition remained long enough to impute constructive knowledge to the defendant." *Byrne*, 877 So. 2d at 465 (¶5) (citing *Downs v. Choo*, 656 So. 2d 84, 86 (Miss. 1995)). "Constructive knowledge is established where the condition is shown to have existed for such a length of time that the operator, through the exercise of reasonable care, should have known of . . . its existence." *Almond*, 957 So. 2d at 439 (¶8) (quoting *Munford Inc. v. Fleming*, 597 So. 2d 1282, 1284 (Miss. 1992)).

¶15. Here, it is undisputed that Thomas was a business invitee and that The Shed had a duty to keep the premises, and specifically the picnic benches, in a reasonably safe condition. The issue is whether The Shed breached that duty because a picnic table collapsed. Thomas

proceeds under the negligence theory that The Shed breached its duty by creating a dangerous condition in buying substandard tables and had actual or constructive knowledge of this danger. Thomas further claims that her expert witnesses would have proved this dangerous condition and The Shed's knowledge of it.

## I.     Summary Judgment

¶16.    Thomas argues there was a genuine issue of material fact whether The Shed maintained its premises in a reasonably safe manner. She claims that The Shed created a "dangerous condition" by buying cheap, residential-grade furniture that failed because it was not intended for more rigorous restaurant use. The trial court, however, found there was "nothing inherently dangerous about a wooden picnic bench, which is a common piece of outdoor furniture that held Thomas as she waited on her food and ate her meal." Further, the trial court found that The Shed "discharged its duties by reasonably inspecting and maintaining the restaurant" and had no actual or constructive knowledge of a dangerous condition with the picnic bench. We agree.

¶17.    "[R]egardless of the invitee's precise theory of premises liability, proof that her injury was caused by a 'dangerous condition' is an essential element of her claim." *Jones*, 187 So. 3d at 1104 (¶12). "[A] property owner cannot be found liable for the plaintiff's injury where no dangerous condition exists." *Stanley v. Boyd Tunica Inc.*, 29 So. 3d 95, 97-98 (¶10) (Miss. Ct. App. 2010)). Moreover, a business "is not required to keep the premises absolutely safe, or in such a condition that no accident could possibly happen to a customer." *Stanley v. Morgan & Lindsey Inc.*, 203 So. 2d 473, 476 (Miss. 1967).

8

¶18. Thomas provides no genuine issue of material fact that The Shed breached its duty. Instead, Thomas merely points to the fact The Shed purchased marked-down residential-grade picnic benches instead of commercial-grade furniture. Thomas further argues that a dangerous condition was created because The Shed repaired tables instead of buying new ones.

¶19. The trial court cited *Page v. Biloxi Regional Medical Center*, 91 So. 3d 642 (Miss. Ct. App. 2012), as instructive and controlling. We agree. In *Page*, a hospital visitor sued for negligence against the hospital when his hospital cafeteria chair collapsed, he fell to the ground, and was injured. *Id.* at 643 (¶4). In its motion for summary judgment, the hospital contended that the staff routinely inspected the chairs and that the hospital was unaware the chair might have been broken. *Id.* at 645 (¶14). At the summary judgment hearing, the plaintiff argued that the broken chair was sufficient proof of the hospital's negligence. *Id.* at 644 (¶6). The trial court disagreed and granted the hospital summary judgment. *Id.* at (¶7). In affirming, this Court found the sole fact that the chair broke was not sufficient to show negligence. *Id.* at 645 (¶12). The plaintiff offered no genuine issue of material fact regarding the hospital's breach of a duty. The only fact in support of his claim was that he fell out of the chair, and afterward the chair was bent. *Id.* at 644 (¶11). This Court noted the Mississippi Supreme Court's holding in *Langston v. Kidder*, 670 So. 2d 1, 5 (Miss. 1995), that "mechanical devices simply fail unexpectedly from time to time, and that something more than a device's failure must be shown in order to establish a breach of the standard of reasonable care." *Id.* at 645 (¶12) (quoting *Thomas v. Smith*, 786 So. 2d 418,

9

420 (¶7) (Miss. Ct. App. 2001)). The plaintiff failed to rebut the hospital's motion with any evidence showing it breached the reasonable-care standard. *Id.* at (¶14). As in *Page*, here the only evidence Thomas offered for her claim was that the bench broke. The Shed routinely inspected the picnic benches, and no defect was found. Despite its reasonable care, The Shed was unaware of any issue with the bench until it collapsed.

¶20.    The trial court also found persuasive a case from Ohio, *Dalzell v. Mosketti L.L.C.*, No. 2015-CA-93, 2016 WL 3032733 (Ohio Ct. App. May 27, 2016), where summary judgment was affirmed for the restaurant-defendant. *Id.* at *1. In this factually analogous case, the plaintiff sat at an outdoor picnic table at a restaurant, and the bench broke, causing her injury. *Id.* The trial court noted there was no indication to the restaurant or the plaintiff that the bench was going to break. *Id.* at **3-4. Further, the picnic tables, purchased at Lowe's less than a year before the accident, had never been altered, modified, or repaired, and employees cleaned and inspected them daily. *Id.* at *5. The court found summary judgment proper because the restaurant had no knowledge there was a defect with the bench prior to the plaintiff's fall. *Id.* at *7.

¶21.    The Shed cites the recent *Walker v. Cellular South Inc.*, 309 So. 3d 16 (Miss. Ct. App. 2020), as analogous. In *Walker*, this Court affirmed the grant of summary judgment for the defendant as well as the exclusion of the plaintiff's expert witness in a premises liability case involving a fall from a chair at a C Spire store. *Id.* at 19 (¶1). When the plaintiff-customer tried to sit on a bar-height chair, it slipped from underneath him, and he fell. *Id.* at (¶3). The trial court found, after excluding the expert-witness opinions regarding

the slickness of the floor, that the plaintiff "was left with no evidence of a dangerous condition [at the store] or that Cellular South had actual or constructive notice of a dangerous condition . . . ." *Id.* at 25 (¶30). Similarly, here there is no evidence of a dangerous condition with the picnic bench itself.

¶22. Neither Thomas nor The Shed had any knowledge of a defect with the bench. Even though the picnic bench ultimately broke, this happened when Thomas was preparing to leave. She had no explanation as to why it broke. Further, there was no evidence The Shed was negligent in failing to repair properly an alleged dangerous condition with the picnic benches. Burdeshaw's and Mullinax's testimony show the employees were routinely and periodically inspecting all the picnic tables and benches to make sure they were safe, and no defects were observed. If the tables and benches needed repair, an individual removed them and repaired them unless they needed to be replaced completely. Moreover, there is no evidence the picnic tables "routinely failed," as Thomas claims. In conclusion, Thomas demonstrated no genuine issue of material fact whether The Shed breached the duty to keep the restaurant reasonably safe.

## II. Thomas's Expert Witness Opinions

¶23. Thomas also argues that the trial court improperly struck her two expert witnesses' affidavit testimony and opinions attached to her motion in opposition to summary judgment. Thomas claims her experts' opinions created a genuine issue of material fact as to whether The Shed provided a safe environment for its guests.[3]

---

[3] The separate opinion criticizes the majority for discussing the expert-witness issue, which was the crux of Thomas's argument on appeal. Thomas claimed the trial court

¶24.    The standard of review for the admission or exclusion of evidence, including expert testimony, is an abuse of discretion. *Matthews*, 926 So. 2d at 212 (¶5). The admission of expert testimony is within the sound discretion of the trial judge; therefore, the trial judge's decision will stand unless "the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion." *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (¶4) (Miss. 2003) (citation omitted).

¶25.    Admission of expert testimony is governed by Rule 702 of the Mississippi Rule of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"[F]or expert testimony to be admissible, it must be both relevant and reliable"; that is, "the testimony must be capable of being applied to the facts at issue" and "scientifically valid." *Thompson v. Holliman*, 283 So. 3d 718, 722 (¶16) (Miss. 2019) (citing *Daubert*, 509 U.S. at 592); *Matthews*, 926 So. 2d at 213 (¶6) (citing *McLemore*, 863 So. 2d at 36 (¶11)). "The party offering the testimony must show that the expert based his opinion not on opinions or speculation, but rather on scientific methods and procedures." *Matthews*, 926 So. 2d at 213

---

improperly struck her expert-witness testimony, which would have confirmed The Shed used substandard furniture for commercial use and thereby created a dangerous condition. Accordingly, we find it necessary to discuss the issues. In doing so, we do not raise the standard for the admission of experts beyond that of precedent, as the separate opinion contends.

(¶6). In examining the reliability of an expert's opinions and methods, the trial court must look at factors, including

> whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community.

*McLemore*, 863 So. 2d at 37 (¶13) (citing *Daubert*, 509 U.S. at 592-94).

¶26. Thomas hired Dr. Nusbaum and Cherepon to provide opinions that The Shed used substandard, residential-grade furniture that was not intended for commercial use and created a safety issue resulting in Thomas's fall. To arrive at his conclusions, Dr. Nusbaum reviewed the pleadings, depositions and attached photographs, and web pages of Lowe's and Home Depot depicting picnic tables. At the beginning of his five-page report, Dr. Nusbaum conceded that "the restaurant industry does not have a published set of 'recognized' practices related to such design and operation issues as furniture selection and maintenance." He stated there were other sources, however, that provided "best practices," such as magazines, furniture manufacturers, industry associations, and trade groups. He stated that furniture in a restaurant "is subject to more intense wear and tear" than in a residential setting; thus, it is recommended, but not required, by designers to use "commercial" grade products that are built of higher quality materials. He observed a photograph of the broken bench, which showed many large knots in the wood that would weaken it; he stated commercial-grade wood would have fewer, smaller knots and be rot-resistant. Nusbaum concluded that the picnic tables were residential grade and that their use was inappropriate

13

in a restaurant because in a commercial setting, their use likely would lead to premature failure and possible injury. Moreover, he opined The Shed management failed to have a system to identify, inspect, and maintain the furniture; therefore, it was impossible to track how long the table at issue had been used and whether it should have been discarded.

¶27. Thomas also hired Cherepon to perform an independent scientific evaluation of the picnic bench's collapse. Cherepon's three-page report stated he inspected an exemplar picnic table and reviewed photographs of the table taken after the incident, the Lowe's website, pleadings, and deposition testimony. He stated that structures should be designed to "support all anticipated loads" and that "each seat board should be capable of supporting over 700 pounds." Further, he said that "[a] higher factor of safety should be considered for outdoor condition" because "elements may degrade performance." Cherepon observed that photographs of the bench indicate it failed near a knot. His exemplar picnic table from Lowe's was rated for residential use, had a six-person seating capacity, and was made of No. 2 grade lumber. He claimed this grade of lumber contained "more knots and less usable material than higher grade lumber," and knots can significantly decrease strength. Cherepon concluded that The Shed "selected a low grade picnic table for [its] outdoor seating area" and that if "[h]igh grade lumber and/or coated steel" furniture had been used, the "incident would have been avoided." Cherepon attached to his report two pages of hand-written notes and mathematical calculations, several pages on load and resistance-factor design values from the 2015 edition of "National Design Specification for Wood Construction," as well as other information on picnic tables from various organizations.

¶28. The trial court entered a separate order striking the expert opinions of Dr. Nusbaum and Cherepon, finding them impermissible under *Daubert* and its progeny. The trial court concluded that the opinions were neither relevant nor reliable. The experts did not address whether The Shed had actual or constructive notice of a defect with the bench. Further, Thomas did not offer any foundational evidence that the opinions had scientific validity in general or were the product of a specific methodology with a known rate of error, peer-review, or controlling standard. In addition, the trial court found that even if the opinions were allowed, they would not create a genuine issue of material fact.

¶29. We find the trial court did not abuse its discretion in striking these two opinions. Neither expert opinion indicated that The Shed had notice of a defect in the seat boards. Neither expert examined or saw the broken bench; they merely looked at photographs of it.[4] Cherepon merely found a similar, exemplar bench from Lowe's upon which to base his findings. Importantly, the experts provided no accepted industry standards for furniture selection in the restaurant industry; in fact, Dr. Nusbaum admitted that there were none. He further stated that The Shed failed to maintain its furniture but also stated he was unable to determine what maintenance the picnic table had received because he claimed that The Shed's management had no routine maintenance system in place.

¶30. *Walker* is again instructive. In that case, the plaintiff obtained an expert to show there was insufficient traction between the stool's feet and the store's floor surface. *Walker*, 309 So. 3d at 22 (¶18). The trial court struck the plaintiff's expert opinion, finding it unreliable

_____

[4] In the pleadings before the circuit court, Thomas contends that the reason the experts could not examine the table was that The Shed had discarded it.

and irrelevant because the expert admitted he used an "untested methodology" and indicated "there was no standard for chair slip cases." *Id.* at 23 (¶22).

¶31.　As in *Walker*, there was no scientific basis to the experts' conclusion that a restaurant's outside use of wooden picnic tables is a substandard practice that could result in safety issues. The experts used no reliable testing methods under *Daubert* to support their findings. Dr. Nusbaum's and Cherepon's conclusions were speculative; there was no scientific testing performed on the subject bench. While Cherepon based his findings on an exemplar bench, he did not offer an opinion regarding the reconstruction of the events that gave rise to the seat boards' collapse. The expert witnesses failed to provide any testing methodology subject to peer review—only their subjective opinions. While Cherepon referenced peer-reviewed publications and technical standards generally accepted in the scientific and engineering communities attached to his report, he did not apply them to the facts at hand. Cherepon provided no scientific support for his opinion that the bench would not have failed if The Shed had used commercial-grade lumber or that a wooden bench is substandard to steel. Finally, the experts offered no authority for imposing a duty on a restaurant to purchase commercial-grade or a certain type of furniture. Accordingly, the trial court did not abuse its discretion in striking Thomas's expert witness testimony.

## CONCLUSION

¶32.　For the foregoing reasons, the trial court did not err in granting The Shed's motion to strike Thomas's expert opinions or granting summary judgment in favor of The Shed.

¶33.　**AFFIRMED.**

16

**CARLTON AND WILSON, P.JJ., GREENLEE, LAWRENCE, SMITH AND EMFINGER , JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.; WESTBROOKS, J., JOINS IN PART.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶34. I agree with the majority that the claims by Ms. Thomas for premises liability due to the collapsing picnic table had to be dismissed. For it is "a recognized maxim" in our jurisprudence that "all things mechanical may eventually fail, and such failure is not, per se, equivalent to negligence on the part of the owner or operator of the mechanical device or machinery." *Langston v. Kidder*, 670 So. 2d 1, 5 (Miss. 1995). Without establishing that the Shed knew of a problem or impending danger from the picnic benches, summary judgment was proper.

¶35. Since the Court is already affirming summary judgment based on this precedent, and not *Daubert*, we should stop there. "It is axiomatic that statements which are unnecessary to a court's ruling are dicta." *C.W. v. Lamar County*, 250 So. 3d 1248, 1254 (¶19) (Miss. 2018). Since the majority's ruling is correctly grounded in a body of law on premises liability, it is wholly unnecessary to delve into the exclusion of the experts.

¶36. Yet once we do, we should follow precedent. In straining to find fault with the experts, both the trial court and the majority misapply Rule 702 to the facts of this case—lambasting the experts for not testing a bench that had been thrown out by the restaurant. Because this radically raises the standard for the admission of an expert, I

17

respectfully dissent in part.

¶37.    We imported *Daubert* from our federal court cousins, and it is important to begin with their warning that "the rejection of expert testimony is the exception rather than the rule." *Puga v. RCX Sols. Inc.*, 922 F.3d 285, 294 (5th Cir. 2019) (quoting Fed. R. Evid. 702 advisory committee notes (2000)).    Far too often litigants seek to exclude experts not because they are not qualified, or don't have admissible evidence, but because they just don't like what they have to say.    But as the Supreme Court itself has cautioned, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

¶38.    The majority scolds the experts because "there was no scientific testing performed on the subject bench" from the barbeque joint and because the experts "merely looked at photographs of it."    Yet at the hearing on the motion for summary judgment, counsel for Ms. Thomas explained to the trial court that the Shed "discarded . . . or destroyed" the picnic bench.[5]    Indeed, the Shed's manager, Joseph Mullinax, more or less agreed that he threw the damaged picnic table out after "it sat around there for a period of time," and while he didn't "plan[] on doing it," it was just part of his normal cleanup and effort to keep the premises

---

[5] Since this representation was made in court, to a circuit judge, by a member of the Bar, and was never contradicted in any way by the Shed or its counsel, we should accept it as true.    *See* Miss. R. Prof. Conduct 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and in fact for doing so that is not frivolous."); Miss. R. Prof. Conduct 3.3(a)(1) ("A lawyer shall not knowingly . . . make a false statement of material fact or law to a tribunal.").

Given our standard of review at summary judgment—which is to assume all facts in favor of the nonmovant—this means the picnic bench was discarded or destroyed.

safe.

¶39. So I find it baffling that the majority returns to this point repeatedly to find that the experts did not do "reliable" testing since they examined similar picnic tables and reviewed photographs. *This is exactly what experts do* and *the only thing they can do* when the item in question is gone or the scene is transient.

¶40. This is not only accepted by our courts, it's so commonplace as to be unremarkable. For instance, the Fifth Circuit has approved an expert even though "some measurements were missing," but "[h]e took photographs of the scene," "spoke to witnesses," and examined the scene. *Puga*, 922 F.3d at 295; *see Burroughs Diesel Inc. v. Baker Petrolite LLC*, No. 2:18-CV-26-KS-MTP, 2019 WL 5395452, at *10 (S.D. Miss. Oct. 22, 2019) (declining to exclude expert when his evidence "rests on reasonable—yet not perfect—premises and data," including "rel[ying] on photographs of tools and equipment taken by other experts that showed corrosion, rust, and pitting on various metal tools, equipment, and components"); *Vigil v. Michelin N. Am. Inc.*, No. EP-05-CV-001-KC, 2007 WL 2778233, at *4 (W.D. Tex. Aug. 23, 2007) (where a deputy was allowed to testify as an expert based on "'his accident report, some photographs and his notes'"); *Main v. Eichorn*, No. W-10-CV-158, 2011 WL 11027844, at *4 (W.D. Tex. Mar. 10, 2011) (where a police officer was allowed to testify as an expert even though he "did not take any measurements or photographs, or speak to any witnesses to the accident" but "did personally survey the accident scene, talk to the other officers on the scene, and subsequently reviewed photographs of the scene").

19

¶41. Accordingly, an expert may review photographs taken by himself or others and use them to formulate an opinion. This conclusion rests in part on an implied understanding of how information flows in trial. In our state courts, we have Mississippi Rule of Evidence 703. This rule expressly declares that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." MRE 703. Furthermore, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible" to even be relied upon by the expert. MRE 703. I think it is beyond the need for debate or citation that an expert would use a photograph of a destroyed item in order to formulate an opinion.

¶42. Last, in striving to find error with the experts, the majority emphasizes that they didn't "offer any foundational evidence" their opinions "were the product of a specific methodology with a known rate of error, peer-review, or controlling standard." But this pretends that *Daubert* is a checklist and that the two engineers didn't mark the right box. But of course *Daubert* is "a non-exhaustive, illustrative list," not a checklist, and "[t]he applicability of these factors depends on the nature of the issue[.]" *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 36-37 (¶13) (Miss. 2003). In the end, this is supposed to be a "flexible" standard, as case after case has stated. *Id*.

¶43. We don't need peer-reviewed testing or the original bench to determine if a grade of lumber is higher or lower than others, which was one of the points made by the expert. We can simply rely upon the technical insight of an expert who, like here, can explain different grades of lumber and why that impacts the longevity of furniture.

¶44. While this is all just dicta in the majority's opinion, it could have real-world effects. In raising the standard of admission for experts far higher than our Supreme Court or the federal courts, we chill access to the court system for those who have suffered losses and are seeking a remedy. This is troubling, especially because it is wholly unnecessary to the disposition of this case. Accordingly, I must respectfully dissent to that portion of the majority's opinion.

**McDONALD, J., JOINS THIS OPINION. WESTBROOKS, J., JOINS THIS OPINION IN PART.**